# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TALANDIS COTTON (#610891)**

**VERSUS**

**ROBERT TANNER, ET AL.**

**CIVIL ACTION**

**NO. 18-539-BAJ-RLB**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have fourteen (14) days after being served with the attached Report to file written objections to the proposed findings of fact, conclusions of law and recommendations therein. Failure to file written objections to the proposed findings, conclusions, and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge which have been accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on November 6, 2019.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**

1

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TALANDIS COTTON (#610891)**

                                                            **CIVIL ACTION**

**VERSUS**

                                                            **NO. 18-539-BAJ-RLB**

**ROBERT TANNER, ET AL.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This matter is before the Court on the petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, the petitioner's application should be denied. There is no need for oral argument or for an evidentiary hearing.

The petitioner, Talandis Cotton, challenges his conviction, entered in 2013 in the Twenty Third Judicial District Court for the Parish of Ascension, State of Louisiana, of attempted aggravated kidnapping. On May 1, 2018, the petitioner filed a petition for a writ of habeas corpus contending: (1) Louisiana's "attempt" statute is unconstitutional and the state failed to prove an essential element of the crime of attempted aggravated kidnapping, (2) his due process rights were violated through the erroneous admission of "other crimes" evidence, (3) his right to a speedy trial was violated, (4) he received ineffective assistance of counsel from his trial counsel, (5) he received ineffective assistance of counsel from his post-trial counsel, (6) prosecutorial misconduct, and (7) the jury instructions were constitutionally infirm.

### Procedural History

After a trial by jury conducted in February of 2013, the petitioner was found guilty of attempted aggravated kidnapping, and on October 28, 2013 the petitioner was sentenced to fifteen years imprisonment at hard labor without benefit of parole, probation, or suspension of

sentence.  The petitioner thereafter appealed his conviction to the First Circuit Court of Appeal, asserting as counseled errors: the evidence was insufficient to support the verdict and ineffective assistance of counsel.  He also asserted *pro se* errors:  the trial court failed to give a jury instruction on the definition of "dangerous weapon" and the trial court failed to give a jury instruction on his "medical records" affirmative defense.  On June 6, 2014, the petitioner's conviction and sentence were affirmed by the First Circuit.  *State v. Cotton,* 2014-0034 (La. App. 1 Cir. 6/6/14), 2014 WL 3843938.  The petitioner's application for supervisory review in the Louisiana Supreme Court was denied on February 27, 2015.  *State v. Cotton*, 2014-1485 (La. 2/27/25), 159 So.3d 1065.

On or about November 4, 2015, the petitioner filed an application for post-conviction relief in the Twenty Third Judicial District Court.  Pursuant to an Order dated January 8, 2016, the petitioner's application was denied in the trial court.  The petitioner's requests for review of the denial of his application for post-conviction relief, were denied on September 6, 2016 and February 2, 2018,[1] respectively.

On or about May 1, 2018, the petitioner filed the instant application for habeas corpus relief in this Court.

### Factual Background

The facts, as accurately summarized in the decision of the Louisiana First Circuit Court of Appeal[2] are as follows:  On January 17, 2012, Melissa Cotton, an employee at St. Elizabeth Hospital in Gonzales, LA, was finishing her evening shift, when around 6:00 p.m., a hospital security guard approached and informed her that a box was tucked underneath her vehicle.  Ms.

---

[1] *State ex rel. Cotton v. State*, 2016-1895 (La. 2/2/18), 234 So.3d 883.
[2] *State v. Cotton*, 2014-0034 (La. App. 1 Cir. 6/6/14), 2014 WL 3843938.

Cotton informed the guard she was unaware of any box, and after she finished treating her patient, she walked to her vehicle.  The security guards and Ms. Cotton began searching through the box's contents, which she identified as coming from her vehicle's trunk.  Ms. Cotton attempted to open the car's trunk with her keyless entry, but the trunk lid would not open.  Eventually, the guards were able to open the trunk, where they found the petitioner tucked inside.  Upon seeing the petitioner, Ms. Cotton testified she became "hysterical," and ran inside the hospital yelling for someone to call 911.  The petitioner was subsequently removed from the vehicle, and as he was being escorted to the hospital security desk, he said "so this is how you gonna do it, huh?" as he passed Ms. Cotton.  Additionally, Ms. Cotton testified that inside her trunk was a lever which allowed the backseat to move forward, and at the time when the defendant was found, the seat was inclined forward, with the petitioner's head positioned on the driver's side.  Furthermore, Ms. Cotton testified that none of the items found in the trunk belonged to the petitioner.

At the time of the instant crime, the petitioner and Ms. Cotton remained married, though they physically separated in November 2011.  Ms. Cotton also explained that about one month prior to the current incident, she returned to her home to find the petitioner present in her house.  She was unaware of how the petitioner entered her home as he had supposedly returned his key to her.  Ms. Cotton indicated that the petitioner initially pushed her against the bedroom and closet doors, and then pushed her onto the bed.  The petitioner then caught Ms. Cotton in a chokehold and began to explain how much he loved her.  Ms. Cotton testified that the only way she was able to escape from the petitioner's chokehold was to agree that she loved him, and that they could work out their differences.  She believed it was what the petitioner wanted to hear and

was eventually released from his grasp.  Afterwards, the two moved into a spare bedroom, where the petitioner cornered Ms. Cotton and would not let her leave the room.  While in the bedroom, one of Ms. Cotton's neighbors called her, and subsequently arrived at her house.  When Ms. Cotton greeted her neighbor, she gave her a hug and asked the neighbor to call 911.  The police subsequently arrived.  Following this incident, Ms. Cotton obtained a restraining order against the petitioner.  In fact, the day before the incident at the hospital, Ms. Cotton spoke to the petitioner on the telephone in order to obtain a valid address so he could be served with the order.

Two hospital security guards testified at trial.  Major Brandon Gilmore stated that earlier in the evening on January 17, 2012, he walked out to his vehicle, where he noticed a box underneath Ms. Cotton's car.  After Ms. Cotton informed him that she was unaware of the box's presence, Major Gilmore and two other security guards returned to the vehicle.  Officer Bruce Pearson removed the box from underneath the car, and various items such as clothes, a cell phone charger, and "all kind of stuff" were found therein.  Major Gilmore returned to speak with Ms. Cotton, while the other guards remained by the vehicle.  Once Ms. Cotton completed her shift, she walked outside with Major Gilmore and attempted to open the trunk using her keyless entry device.  After multiple attempts, one of the guards was able to open the trunk by pulling on its lid, revealing the petitioner inside.  The petitioner was escorted inside the hospital and turned over to the Gonzales Police Department upon their arrival.  Major Gilmore specifically testified that when he inspected the box and the vehicle prior to the trunk being opened, he did not hear any noises, screams, or cries for help coming from within.

Further, Officer Bruce Pearson, another hospital security guard on the night of January 17, 2012, testified at trial. He indicated that when he arrived at the hospital to begin his shift, he noticed the box underneath Ms. Cotton's vehicle. Officer Pearson entered the hospital, made his initial security sweep, and then met Major Gilmore and Officer Gray, a third security officer, at Ms. Cotton's vehicle. Officer Pearson testified that Major Gilmore had Ms. Cotton's keys and inserted a key into the trunk to open it. However, the trunk would not "pop" open, so the three of them pulled on the trunk, and when it opened, the petitioner was found inside, and subsequently instructed to exit the vehicle. As the petitioner was being escorted to the security desk, Officer Pearson testified that the petitioner commented that he went to retrieve his tools from Ms. Cotton's vehicle. Officer Pearson also noticed that the petitioner had zip-ties and was stuffing them into his pockets, which Officer Pearson retrieved. The Gonzales Police Department took over the investigation upon their arrival. Consistent with Major Gilmore's testimony, Officer Pearson testified that prior to opening the trunk, he did not hear any noise coming from within the vehicle that might have indicated someone needed assistance.

Two Gonzales Police Department officers testified at trial. Deputy Jeffery Rogillio arrived on the scene at approximately 6:45 p.m., and after discussing the facts and circumstances with the hospital security guards, he took the petitioner into custody and waited for other officers to arrive. Officer Mike Johnson subsequently arrived and also testified at trial. Officer Johnson read defendant his *Miranda* rights and placed him in the back of his vehicle. As the petitioner was being placed in the back of the squad car, he stated that he went to Ms. Cotton's vehicle to retrieve his tools when the trunk lid fell and trapped him inside. Deputy Rogillio conducted a pat-down of the petitioner, whereby he found a small key in the petitioner's pocket, which

Deputy Rogillio subsequently discovered opened the car's trunk.  Furthermore, in addition to the

zip-ties discovered by the security guards, a toy gun and duct tape were found on the petitioner's

person.

### Standard of Review

The standard of review in this Court is that set forth in 28 U.S.C. § 2254(d).  Pursuant to

that statute, an application for a writ of habeas corpus shall not be granted with respect to any

claim that a state court has adjudicated on the merits unless the adjudication has "(1) resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."   Relief is authorized if a state court has arrived at a

conclusion contrary to that reached by the Supreme Court on a question of law or if the state

court has decided a case differently than the Supreme Court on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

Relief is also available if the state court has identified the correct legal principle but has

unreasonably applied that principle to the facts of the petitioner's case or has reached a decision

based on an unreasonable factual determination.  *See Montoya v. Johnson*, 226 F.3d 399, 404

(5th Cir. 2000).  Mere error by the state court or mere disagreement on the part of this Court with

the state court determination is not enough; the standard is one of objective reasonableness.  *Id*.

*See also Williams v. Taylor*, *supra*, 529 U.S. at 409 ("[A] federal habeas court making the

'unreasonable application' inquiry should ask whether the state court's application of clearly

established federal law was objectively unreasonable").  State court determinations of underlying

factual issues are presumed to be correct, and the petitioner has the burden to rebut that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**Substantive Review**

***Claim (1): Louisiana's Attempt Statute is Unconstitutional/The State Failed to Prove he Intended to Extort Something of Value to Secure a Release***

In Claim 1 the petitioner makes two separate arguments.  First, he asserts that he is entitled to habeas relief because "Louisiana's [attempt] statute[3] is so ambiguous that it, in fact, punishes conduct that falls outside the federal statute's meaning of the offense."[4]  Secondly, he asserts that the state failed to prove that he intended to extort something of value from the victim or a third party in order to secure a release, which is an essential element of attempted aggravated kidnapping.[5]  The state argues that the first part of Claim 1 regarding the unconstitutionality of Louisiana's attempt statute is procedurally defaulted because it was not presented to the trial court, Louisiana's Attorney General was not properly put on notice, and no contemporaneous objection was made at trial.[6]  Alternatively, the state argues that the statute is not unconstitutionally ambiguous because it "clearly sets forth those acts proscribed by law."[7]  With respect to the second part of Claim 2, the state argues that the petitioner's claim does not meet the standard for habeas relief on sufficiency of the evidence.

The Court will first address the state's argument that part of Claim 1 is procedurally defaulted (La. R.S. 14:27 is unconstitutionally vague).  "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court

---

[3] La. R.S. 14:27.
[4] Rec. Doc. 1-1, p. 13.
[5] R. Doc. 1-1, pp. 3-4, 7-14.
[6] R. Doc. 5, p. 14.
[7] R. Doc. 5, pp. 10-13.

rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris v. Reed*, 489 U.S. 255 (1989). The petitioner presented this argument to the trial court in his post-conviction application. The trial court ruling states, "In Claim One, the defendant argues the statute for which the defendant was convicted and sentenced is unconstitutional. The Court finds no merit in defendant's claim one." It is apparent from the plain language of the trial court's ruling that it reached the merits on this claim and did not impose any procedural bar. The First Circuit Court of appeal denied review without comment. The Louisiana Supreme Court denied review, finding "[R]elator fail[ed] to satisfy his post-conviction burden of proof. La.C.Cr.P. art. 930.2. We attach hereto and make a part hereon the district court's written reasons denying relief." Because the last state court rendering judgment did not "clearly and expressly" state that its decision rested on any of the procedural default grounds suggested by the state, the Court is not barred from considering this part of the petitioner's Claim 1.

Turning now to the merits of the petitioner's argument that Louisiana's attempt statute, La. R.S. 14:27, is unconstitutionally vague, the Court finds that it was not an unreasonable application of federal law for the state court to find this part of Claim 1 to be without merit. The petitioner argues that *United States v. Hernandez-Galvan*, 632 F.3d 192 (5th Cir. 2011) and *United States v. Sanchez*, 667 F.3d 555 (5th Cir. 2012) stand for the proposition that "Louisiana's attempt statute of aggravated kidnapping requirements and the substantial step test surrounding his circumstances in his case falls outside the generic definition of a crime, thereby criminalizing

conduct that falls outside the ordinary, contemporary and common meaning of attempted aggravated kidnapping statute."[8]  The petitioner's reliance on these cases is misplaced.

In *United States v. Hernandez-Galvan*, the Fifth Circuit examined North Carolina's attempt statute to determine whether a conviction thereunder would qualify as a predicate "crime of violence" for a sentencing enhancement under the Federal Sentencing Guidelines.  Under the Federal Sentencing Guidelines, if a prior offense "sweeps more broadly" than the generic, contemporary meaning of the terms used in the Guidelines, the conviction cannot be used for sentence enhancement. *Hernandez-Galvan*, at 197.  The Fifth Circuit analyzed whether the defendant's prior conviction in North Carolina for attempted robbery could be used for an enhancement because North Carolina's definition of "attempt" differed from the definition of "attempt" in the Federal Sentencing Guidelines, which uses a "substantial step" approach. Likewise, in *United States v. Sanchez*, the Fifth Circuit examined Texas's attempt statute for the purpose of determining whether the defendant's prior conviction in Texas for attempted sexual assault of a child warranted a sentencing enhancement as a crime of violence.  The petitioner was prosecuted by the State of Louisiana and was not subject to the Federal Sentencing Guidelines. The language quoted by the petitioner from these cases provides no support for the petitioner's claim that Louisiana's attempt statute is unconstitutional.

Other than a recitation of language from these inapposite cases, the petitioner makes no argument in support of his contention that the Louisiana attempt statute is unconstitutional.  The state courts' determination that this part of Claim 1 was without merit was neither contrary to, nor an unreasonable application of federal law.

---

[8] R. Doc. 1-1, p. 6.

The remaining part of Claim 1 is the petitioner's contention that his conviction for attempted kidnapping was based on insufficient evidence. Specifically, the petitioner contends that the state failed to prove he had specific intent to extort something of value from the victim or a third party in order to secure a release. The petitioner contends that because he never had any physical contact with the victim, the state's case with respect this element of the crime is "speculation."[9] The petitioner raised this claim in his counseled direct appeal and in his post-conviction application.

In its opinion on direct review, the Louisiana First Circuit Court of Appeal determined that "any rational trier of fact, viewing the evidence presented in this case in the light most favorable to the state, could find that the evidence proved beyond a reasonable doubt, and the exclusion of every reasonable hypothesis of innocence, all of the elements of attempted aggravated kidnapping." *State v. Cotton*, 2014-0034 (La. App. 1 Cir. 6/6/14), 2014 WL 3843938. With respect to the petitioner's argument that the state failed to prove specific intent to extort something of value to obtain a release, the First Circuit cited to its opinion in *State v. Leger*, 2005-0011 (La. 7/10/06), 936 So.2d 108, holding:

> The instant case follows *Leger* closely. The evidence elicited at trial reflects that approximately one month before the incident, the defendant entered Ms. Cotton's home, physically attacked her, and refused to release her in an attempt to rekindle the marital relationship. Ms. Cotton specifically testified that she told the defendant what she thought he wanted to hear in order to escape his grasp. As with *Leger,* in the instant case, a reasonable juror could have found that one of the "apparent triggers" for the defendant's actions was Ms. Cotton's refusal to rekindle the marital relationship and that the defendant attempted to imprison the victim and, as he did one month before, play on her fear and hope of eventual release to force her to comply with his demands. The record demonstrates that the defendant hid inside Ms. Cotton's vehicle with plastic zip-

---

[9] R. Doc. 1-1, p. 14.

ties, duct tape, and a toy gun and had access to the inside of the vehicle by way of the rear seat.

*Id*. at *4.

The Supreme Court set out the test for analyzing constitutional challenges to the sufficiency of the evidence in *Jackson v. Virginia,* 443 U.S. 307 (1979), which held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt." *Id*. At 319.   A federal *habeas* court is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses in place of the fact-finder. *Weeks v. Scott,* 55 F.3d 1059, 1062 (5th Cir.1995); *Alexander v. McCotter,* 775 F.2d 595, 598 (5th Cir.1985).  In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir.2001) (*quoting Herrera v. Collins,* 506 U.S. 390, 402 (1993)).   Moreover, because the state court's decision applying the already deferential *Jackson* standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in fact "twice-deferential." *Parker v. Matthews,* 567 U.S. 37 (2012); *see also, Coleman v. Johnson,* 132 S.Ct. 2060, 2062 (2012).

The Louisiana First Circuit Court of Appeal clearly reviewed the essential elements of the crime and held that the jury had reasonably inferred the specific intent necessary to support a conviction for attempted aggravated kidnapping.  Specifically, the jury heard that a month before the petitioner's arrest for aggravated kidnapping, the petitioner entered the victim's home, and held her against her will while trying to convince her to resume their marital relationship.  A

12

rational trier of fact could have concluded that the petitioner intended to extort a reconciliation from the victim.  It is not this Court's role to second guess the jury's role as a fact-finder.  It is also not this Court's role to determine whether the Louisiana courts correctly applied Louisiana precedent.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241. Louisiana's appellate courts' decision on sufficiency of the evidence was neither contrary to, nor an unreasonable application of, United States Supreme Court precedent.  The petitioner is not entitled to relief on this part of his claim.

### Claim (2): "Other Crimes" Evidence

In Claim 2, the petitioner asserts that the trial court erroneously admitted "other crimes" evidence.  The petitioner argues that the evidence of his encounter with the victim at her home one month prior to his arrest for attempted kidnapping should not have been admitted into evidence.  The petitioner also argues that the state court's procedure for allowing the evidence was improper because the prosecution did not comply with Louisiana Code of Criminal Procedure article 720 because it failed to give the defense adequate notice.[10]

The petitioner raised the "other crimes" issue in his *pro se* application for post-conviction relief while discussing ineffective assistance of counsel.  The state court's ruling was limited to the ineffective assistance of counsel claim and did not engage in a federal due process analysis on the admission of the "other crimes" evidence.[11]  If the state courts fail to adjudicate a

---

[10] The petitioner also discusses ineffective assistance of counsel issues in connection with Claims 2-7. All of the petitioner's ineffective assistance of counsel arguments are addressed in Claim 4 & 5, below.

[11] The petitioner's "other crimes" argument can be found on p. 12-13 of his post-conviction application memorandum (R. Doc. 6-4, pp. 99-100). The organization of the petitioner's memorandum makes it unclear whether this is a separate claim or merely argument supportive of his ineffective assistance of counsel claim. The state has not taken the position that this claim is unexhausted. Therefore, the Court will assume, without deciding, that this claim has been exhausted.

petitioner's claim on the merits and the claim is not procedurally barred, no deference is owed to the state-court judgment and the federal court must instead conduct plenary review. *Gonzales v. Thaler*, 643 F.3d 425 (5th Cir. 2011).

The record reflects that the prosecution emailed one of the petitioner's attorneys at 1:09 a.m. on the morning of the first day of trial, advising the defense that it intended to conduct a *Prieur*[12] hearing to determine the admissibility of this other bad act pursuant to La. C.E. art. 404(B)(1).[13] The petitioner's counsel objected to the late notice for the hearing, but the trial judge allowed the hearing to go forward.[14] The victim was called to the stand and testified that approximately one month before the petitioner's arrest for attempted aggravated kidnapping, she came home and found the petitioner hiding in her bedroom. She also testified that the petitioner pushed her on the bed and put her in a "choke hold." The victim testified that she told the petitioner what he wanted to hear about rekindling their relationship so that he would release her.[15] At the conclusion of the *Prieur* hearing the trial judge ruled that the evidence was admissible.[16]

The petitioner's Claim 2 arguments are solely related to violations of Louisiana procedural and substantive law. Namely, the petitioner argues that the "other crimes" evidence should not have been admitted because the trial had already started when the *Prieur* hearing was conducted, the prior incident did not meet the elements of La. C.E. art. 404(B), the state did not prove he committed the prior act by clear and convincing evidence, and the probative value was

---

[12] *State v. Prieur*, 277 So.2d 126 (La. 1973).
[13] R. Doc. 6-2, pp. 74-76.
[14] R. Doc. 6-2, pp. 74-76.
[15] R. Doc. 6-2, pp. 84-89.
[16] R. Doc. 6-2, pp. 110.

outweighed by the danger of unfair prejudice under La. C.E. art. 403.  A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1998).  Federal habeas review is limited to errors of constitutional dimension and federal courts do not sit to review the mere admissibility of evidence under state law. *Estelle v. McGuire*, 502 U.S.62 (1991).  Further, "[i]t is fundamental that federal courts possess only limited authority to consider state evidentiary rulings in a habeas proceeding by a state prisoner." *Phillips v. Wainwright*, 624 F.2d 585, 588 (5th Cir. 1980).  Specifically, that authority is limited to determining whether the evidentiary ruling was so prejudicial "as to deny fundamental fairness to the criminal trial, thus violating the due process clause." *Id.*  In keeping with this principle, the United States Court of Appeals for the Fifth Circuit has stated that a petitioner can obtain federal habeas corpus relief only if evidence is erroneously admitted and "played a crucial, critical, and highly significant role in the trial." *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011) (quotation omitted).  Claim 2 fails because the petitioner cannot show that the evidence was erroneously admitted.

Under Louisiana law, before other crimes (or bad acts) evidence can be admitted as proof of intent, three prerequisites must be satisfied: 1) the prior acts must be similar; (2) there must be a real and genuine contested issue of intent at trial; and (3) the probative value of the evidence must outweigh its prejudicial effect.  *State v. Kahey,* 436 So.2d 475, 488 (La. 1983).  The first prerequisite is met here.  The similarity of the prior act was established by the victim's testimony that the petitioner hid in the victim's bedroom waiting for her to come home, after which the petitioner detained her and attempted to persuade her to resume their marital relationship.  The trial testimony established that the events that led to the petitioner's arrest for aggravated

15

kidnapping involved the petitioner hiding in the trunk of the victim's car with zip ties, duct tape, and a toy gun.  As for the second prerequisite, intent is an essential element of the crime of aggravated kidnapping:

> Aggravated kidnapping is the doing of any of the following acts *with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person* under the offender's actual or apparent control…

La. R.S. 14:44 (in pertinent part) (emphasis added).

In determining whether the probative value of the evidence outweighs its prejudicial effect, the underlying policy is not to prevent prejudice, but to protect against unfair prejudice when the evidence is only marginally relevant to the determination of guilt of the charged crime. *State v. Humphrey,* 412 So.2d 507, 520 (La. 1981).  The record establishes that the evidence was not introduced to impugn the petitioner's character or depict him as a bad man. Instead, the challenged evidence was relevant to an essential element of the offense for which the petitioner was charged.

The evidence meets all three of the *Kahey* prerequisites and was properly admitted to establish matters essential to the charges, including the petitioner's intent to commit aggravated kidnapping.  Because the petitioner has not demonstrated error in the admission of evidence, he has no basis for any due process violation or a denial of a fundamentally fair trial.  *Robinson v. Whitley*, 2 F.3d 562, 567 (5th Cir. 1993).

### *Claim (3): Constitutional Right to a Speedy Trial*

In Claim 3, the petitioner asserts that he was denied the right to a speedy trial. The petitioner clearly asserted this claim in his application for post-conviction relief,[17] but the trial court did not address this claim when denying his application.  Accordingly, the Court will conduct plenary review. *See Gonzales v. Thaler*, *supra*. The Supreme Court prescribes several factors to be considered when evaluating a speedy trial claim: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to speedy trial, and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514 (1972).  None of these factors is either necessary or sufficient to find a speedy trial violation; "[r]ather, they are related factors and must be considered together with such other circumstances as may be relevant." *Id*.  The speedy trial inquiry therefore involves a "difficult and sensitive" balancing of these factors under the particular circumstances of a given case.  *Id*.

On July 1, 2012 the petitioner filed a *pro se* "Motion to Dismiss for Lack of Speedy Trial"[18] and on July 9, 2012, the petitioner filed a "Motion for a Speedy Trial."[19]  In July 6 and July 11, 2012 orders, the trial court forwarded the motions to the petitioner's counsel, Susan Jones, citing Louisiana case law for the proposition that the petitioner did not have the right be both represented and unrepresented.[20]  On July 23, 2012, Susan Jones filed a "Motion for a Speedy Trial,"[21] which was granted on July 24, 2012.[22]  On October 23, 2012, the petitioner's counsel, Susan Jones, moved for a continuance of the trial, claiming that her new position as

---

[17] The petitioner included the argument under a heading that was bolded, underlined, and in capital letters (R. Doc. 6-4, p. 102).
[18] Trial Record, p. 42 (R. Doc. 6 at 67).
[19] Trial Record, p. 44 (R. Doc. 6 at 69).
[20] Trial Record, p. 43, 45 (R. Doc. 6 at 68, 70).
[21] Trial Record, p. 46 (R. Doc. 6 at 71).
[22] Trial Record, p. 47 (R. Doc. 6 at 72).

litigation supervisor was consuming her time.[23]  The petitioner contends that this motion was heard in chambers outside of his presence.  The trial judge noted that Ms. Jones had previously filed a speedy trial motion on behalf of her client.[24]  Ms. Jones advised the trial court that the petitioner agreed to waive his speedy trial rights.[25]  The petitioner asserts that he filed a complaint against Ms. Jones with the Louisiana Disciplinary Counsel for waiving his speedy trial rights without his consent.  The record contains correspondence from the William King with the Louisiana Disciplinary Counsel, referencing File # 2012-RR-301C, dated January 2, 2013, which states: "Ms. Jones has contacted this office and indicated she will be second chair assisting your new attorney.  She has indicated that you are satisfied with her staying on the case.  Therefore, our file will be closed. Please contact me if you have any questions."[26]  The record also includes October 17, 2012 email correspondence sent on behalf of the petitioner to Susan Jones advising Ms. Jones that the petitioner did not want her to continue the trial on October 23, 2012.[27]

The petitioner argues that his counsel waived his constitutional right to a speedy trial without his consent.  A similar situation was addressed by the Second Circuit Court of Appeal in *Wells v. Petstock*, 941 F.2d 253, 256-257 (3rd Cir. 1991):

> Not all constitutional rights must be waived by the defendant personally; only those rights which are fundamental and inherently personal to a criminal defendant, such as the right to testify personally, "can be waived only by the defendant and not by his attorney"…[M]any of the tactical decisions made by defense attorneys throughout the course of their representation of the defendant "implicitly involve the waiver of constitutional rights" but do not require the defendant's personal consent. However, "[w]here an inherently personal right of fundamental importance is involved,

---

[23] R. Doc. 6-1, p. 31-32.
[24] R. Doc. 6-1, p. 32.
[25] R. Doc. 6-1, p. 32.
[26] R. Doc. 6-4, p. 116.
[27] R. Doc. 6-4, p. 125.

> the defendant's [personal] consent is required." Rights that have been found to be inherently personal and of fundamental importance such that only the defendant, not counsel, may waive them include the right to go to trial, the right to be tried by a jury, the right to be represented by counsel, and the right to appeal. We note also that the United States Supreme Court, observing that the right to a prompt trial has its roots in the Magna Carta and earlier ancient sources of law, held that this right "is as fundamental as any of the rights secured by the Sixth Amendment." However, because under the four *Barker* factors Wells' petition does not state facts which arise to a level of a deprivation of the constitutional right to a speedy trial, we do not need to decide whether this right is so fundamental and personal that it can be waived only with the defendant's personal consent.

(internal citations omitted).  Like the habeas petitioner in *Wells v. Petstock,* the petitioner's speedy trial claim does not amount to a constitutional deprivation under the four *Barker* factors and the court need not decide the issue of whether counsel can waive the Sixth Amendment speedy trial right without consent of the client.

The first *Barker* factor, the length of delay, slightly weighs in petitioner's favor in this case.  As the Supreme Court has observed, courts generally view a delay of approximately one year as sufficient to require a full *Barker* analysis. *Id.*  If this threshold showing is made, the court must examine the extent to which the delay extends beyond the bare minimum required to trigger a *Barker* analysis, because "the presumption that pretrial delay has prejudiced the accused intensifies over time." *Id.*  The petitioner was arrested for attempted aggravated kidnapping on January 17, 2012.  A bill of information was filed by the state on March 9, 2012.[28] The trial began on February 26, 2013.[29]  The state argues that the one-year threshold was not met because less than a year passed between the bill of information and the start of trial.  However, the period

---

[28] Trial Record, p. 25.
[29] R. Doc. 6-1, p. 114.

of delay starts when a person is accused of a crime and ends when the trial begins. *United States v. Marion*, 404 U.S. 307 (1971). The arrest, if prior to the [bill of information], constitutes the initiation of a prosecution for purposes of applying the Barker speedy trial test. *Dillingham v. United States*, 423 U.S. 64 (1975). Because a year and 41 days passed between the petitioner's arrest and his trial, full *Barker* analysis is triggered. The "length of delay" factor weighs in the petitioner's favor, although only slightly because the delay exceeded one year by just 41 days.

Considering the second *Barker* factor, reason for the delay, there is no evidence that the state made a "deliberate attempt to delay the trial in order to hamper the defense." *Barker*, 407 U.S. at 531. The third *Barker* factor is assertion of the right. The petitioner asserted his right to a speedy trial in a *pro se* motion to the trial judge. However, this factor is outweighed by the fourth *Barker* factor, prejudice. Once a court "undertakes a full *Barker* analysis," it "weigh[s] the first three ... factors against any prejudice suffered by the defendant due to the delay in prosecution." *United States v. Frye,* 372 F.3d 729, 736 (5th Cir.2004). Because none of the three factors are weighed heavily against the state, the petitioner has not shown that he is entitled to a presumption of prejudice. As a result, he must establish actual prejudice to prevail on his speedy trial claim. *United States v. Frye*, 489 F.3d 201 (5th Cir. 2007). The petitioner points to no specific testimony, evidence or opportunities for the defense that were lost due to the delay. The petitioner has failed to identify an actual prejudice. Therefore, his speedy trial claim must fail. *See United States. v. Hernandez*, 457 F.3d 416 (5th Cir. 2006).

### *Claims (4) & (5): Ineffective Assistance of Counsel*

In Claim 4, the petitioner asserts that he received ineffective assistance of counsel during the pretrial and trial stages of the prosecution. In Claim 5, the petitioner asserts that he received

ineffective assistance of counsel during post-trial proceedings. Throughout the petitioner's memorandum, he also discusses ineffective assistance of counsel in connection with Claims 2, 3, 6 & 7. The petitioner asserts that his counsel's performance at the *Prieur* hearing was ineffective (Claim 2), his counsel waived his speedy trial rights without his consent (Claim 3), his counsel failed to adequately cross-examine Officer Rogillio at trial (Claim 6), and his counsel failed to object to the jury instructions as he requested (Claim 7).[30]

The factual background of the petitioner's representation bears discussion. On the original trial date of October 23, 2012, Susan Jones was the only counsel of record for the petitioner.[31] After Ms. Jones moved for a continuance and waived the petitioner's speedy trial rights, the petitioner filed a complaint with the Louisiana Disciplinary Counsel. The petitioner contends that Phyllis Southall then became his lead counsel. When the trial commenced on February 26, 2013, the record reflects there were four attorneys present and representing the petitioner: Susan Jones, Don Williams, Phyllis Southall, and Seth Dornier. The petitioner contends that he was unaware that Seth Dornier or Don Williams were his attorneys until he arrived at trial.[32] He also contends that Phyllis Southall was supposed to be his lead attorney at trial.[33] After jury selection on the first day of trial, the court held a *Prieur* hearing.

The victim began testifying at the *Prieur* hearing that the petitioner held her captive at her home, including pushing her on the bed and putting her in a "choke hold."[34] Ms. Jones interrupted the testimony to approach the bench and a bench conference was held:

---

[30] The ineffective assistance issues related to Claim 7 are discussed with Claim 7, below.
[31] R. Doc. 6-1, p. 31.
[32] Rec. Doc. 1-1, p. 24.
[33] Rec. Doc. 1-1, p. 24.
[34] R. Doc. 6-2, pp. 76-77.

**Ms. Jones:**
At some point in Phyllis's life she was abused by her husband. She just had like almost an attack. I told her she should leave because she said that is almost what happened to her and she can't go on and she can't sit there. And, so we have a problem.
**The Court:**
What's the problem?
**Ms. Jones:**
Because---
**The Court:**
They got you and they got Dornier and Williams. I'm missing something?
**Ms. Jones:**
I mean she was going to question the witness and all that.
**The Court:**
Let somebody else do it.
**Ms. Jones:**
And the problem is, Judge, is that she was going to do the cross examination of the victim tomorrow. I'm just kind of concerned.
**The Court:**
Let's proceed.

Despite lead counsel's inability to continue, the court went forward with the *Prieur* hearing and Ms. Jones cross-examined the victim. At the conclusion of the hearing, the trial court ruled in the prosecution's favor. The petitioner contends that he received ineffective assistance of counsel because Ms. Southall abandoned him, he had a conflict with Ms. Jones, and Mr. Dornier and Mr. Williams were unprepared.

After conclusion of the evidence at trial, the jury returned a guilty verdict. On July 22, 2013, Susan Jones withdrew as counsel of record, leaving Seth Dornier to represent the petitioner.[35] Mr. Dornier failed to appear for a scheduled post-trial hearing on behalf of the petitioner. The trial court continued the hearing, issued a show-cause order on why Mr. Dornier should not be held in contempt, and ordered attorney, Alan Robert, to represent the petitioner.[36]

---

[35] Trial Record, p. 111.
[36] R. Doc. 6-1, pp. 48, 99-104.

Mr. Robert filed post-trial motions on behalf of the petitioner, including a motion for a new trial asserting ineffective assistance of counsel.  On September 23, 2013, the trial court heard testimony from Phyllis Southall, Seth Dornier, and Don Williams in connection with the petitioner's ineffective assistance of counsel claim. Ms. Jones did not testify.

Ms. Southall testified that when she came on the case Ms. Jones was lead counsel.  She eventually became lead counsel, with Ms. Jones as second chair.[37]  Ms. Southall admitted that she had difficulty fulfilling her duties because she became upset about something in her personal life and abruptly left the court.  She came back the next day but did not cross examine the victim as planned. Ms. Southall testified that she was present for the entire trial, except for the *Prieur* hearing.[38]

Mr. Dornier testified that within 24 hours of the start of the trial he was instructed by Ms. Jones to make all legal motions.  Mr. Dornier was present for most of the trial. He testified that the judge instructed him to leave after he argued the jury instructions and he did not return.  Prior to the trial it was his understanding that Phyllis Southall was to be lead attorney at trial.[39]

Don Williams testified that prior to trial he understood that his role was to assist with jury selection. Prior to trial he understood that Ms. Southall was to be first chair and Ms. Jones second chair.  He took a more active role when Susan Jones became first chair. He ended up handling some voir dire panels, questioning some witnesses on cross examination, and performing the closing argument.[40]

---

[37] R. Doc. 6-1, pp. 74-75.
[38] R. Doc. 6-2, pp. 74-81.
[39] R. Doc. 6-1, pp. 82-87.
[40] R. Doc. 6-1, pp. 89-94.

During the ineffective assistance of counsel hearing, the trial judge commented that he recalled Ms. Jones, "had all of these lawyers sitting around and she was farming out little pieces of the trial to them."[41]  Relying on the number of attorneys present and his personal observation that the attorneys were prepared, the trial judge denied the petitioner's motion for a new trial on the grounds of ineffective assistance of counsel.[42]

In Claim 4, the petitioner contends that he received ineffective assistance of counsel from Phyllis Southall because she abandoned him during the *Prieur* hearing, he received ineffective assistance of counsel from Susan Jones because she waived his speedy trial rights without his consent, and he received ineffective assistance of counsel from Don Williams because he was unprepared.  In Claim 5, the petitioner contends that he received ineffective assistance of counsel from Alan Robert during post-trial proceedings because Mr. Robert did not address Officer Rogillio's inconsistent trial testimony in his post-trial motions.[43]  The petitioner contends that he received ineffective assistance of counsel from Seth Dorner during post-trial proceedings because Mr. Dornier failed to appear for the originally scheduled post-trial motion hearing.

A habeas petitioner who asserts that he was provided with ineffective assistance of counsel must affirmatively demonstrate (1) that his counsel's performance was "deficient", *i.e.*, that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment; and (2) that the deficient performance prejudiced his defense, *i.e.*, that counsel's errors were so serious as to deprive the petitioner of a fair trial, a trial in which the result is reliable.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The

---

[41] R. Doc. 6-1, p. 43.
[42] R. Doc. 6-1, p. 97-98.
[43] Rec. Doc. 1-1. p. 27. Officer Rogillio's testimony is addressed in detail in connection with Claim 6, below.

petitioner must make both showings in order to obtain habeas relief based upon the alleged ineffective assistance of counsel. *Id.*

   To satisfy the deficiency prong of the *Strickland* standard, the petitioner must demonstrate that his counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional standards. *See,* e.g.*, Martin v. McCotter*, 796 F.2d 813, 816 (5th Cir. 1986). The reviewing court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional competence and that, under the circumstances, the challenged action might be considered sound trial strategy. *See,* e.g., *Bridge v. Lynaugh*, 838 F.2d 770, 773 (5th Cir. 1988). This Court, therefore, must make every effort to eliminate the distorting effects of hindsight and to evaluate the conduct from counsel's perspective at the time of trial. *Martin v. McCotter*, *supra*, 796 F.2d at 817. Great deference is given to counsel's exercise of professional judgment. *Bridge v. Lynaugh*, *supra*, 838 F.2d at 773; *Martin v. McCotter*, *supra*, 796 F.2d at 816.

   If the petitioner satisfies the first prong of the *Strickland* test, his petition nonetheless must affirmatively demonstrate prejudice resulting from the alleged errors. *Earvin v. Lynaugh*, 860 F.2d 623, 627 (5th Cir. 1988). To satisfy the prejudice prong of the *Strickland* test, it is not sufficient for the petitioner to show that the alleged errors had some conceivable effect on the outcome of the proceeding. *Strickland v. Washington*, *supra*, 466 U.S. at 693. Rather, the petitioner must show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. *Martin v. McCotter*, *supra*, 796 F.2d at 816. The habeas petitioner need not show that his counsel's alleged errors "more likely than not" altered the outcome of the case; he must instead show a probability that the errors are "sufficient to

undermine confidence in the outcome." *Id*. at 816-17.  Both the *Strickland* standard for ineffective assistance of counsel and the standard for federal habeas review of state court decisions under 28 U.S.C. § 2254(d)(1) are highly deferential, and when the two apply in tandem, the review by federal courts is "doubly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

The petitioner argues that the Court should analyze his ineffective assistance of counsel claims under *U.S. v. Cronic*, 466 U.S. 648 (1984) because Ms. Southall "abandoned him at trial."[44]  Denial of counsel altogether, actually or constructively, which is a *Cronic* claim, requires that conviction be "overturned because prejudice is presumed."  However, *Cronic* does not apply in situations where counsel is substituted mid-trial:

> If any break in the continuity of counsel at trial were sufficient to create a presumption of prejudice, even where a *different* attorney for the accused was present at critical stages missed by the lead counsel, the Sixth Amendment's guarantee would resemble less the assurance of "effective" representation and instead demand something closer to a "perfect" defense. While perfection may seem a laudable goal, this latter threshold of performance is not demanded by our Constitution.

*United States v. Bell*, 795 F.3d 88, 96 (D.C. Cir. 2015) (internal citations omitted).  It may have been a best practice for the trial judge to continue the trial until the next day to allow Ms. Jones or other counsel to more fully prepare for the *Prieur* hearing in light of Ms. Southall's absence. However, "best practice" is not the standard for constitutional deficiency. *Id*.

Ineffective assistance of counsel claims based on a lack of continuity of counsel are analyzed under *Strickland*, which requires a showing that but-for counsel's professional errors, the result of the proceeding would have been different.  *Harris v. Commissioner, Alabama*

---

[44] Rec. Doc. 1-1, p. 24-25.

*Department of Corrections*, 874 F.3d 682 (11th Cir. 2017). While the change of counsel may have caused lack of continuity in his defense, the petitioner has failed to explain how specific acts or omissions of any of his attorneys led to an erroneous result or how the outcome would have been any different had any one of his attorneys performed a different role during the proceedings. *Id* at 691 (denial of habeas relief where petitioner had 11 different court appointed defense attorneys, but petitioner made no showing as to how counsel's specific acts or omissions caused the failed trial strategy).

With respect to Ms. Jones's alleged waiver of the petitioner's speedy trial rights without his consent, the petitioner fails to explain how the resulting 4-month delay in the proceedings caused him any prejudice. As discussed above, he points to no specific testimony, evidence or opportunities for the defense that were lost due to the delay. The court is certainly not enamored with the idea that the petitioner's counsel may have waived his speedy trial rights against his wishes, but the petitioner has failed to show any prejudice from this alleged error.

The petitioner also fails to explain or show any prejudice from the alleged failure of Mr. Robert to raise Officer Rogillio's inconsistent trial testimony during post-trial motions. As discussed in the detail below along with Claim 6, Officer's Rogillio's trial testimony may be considered inconsistent with his preliminary hearing testimony. However, the petitioner has not demonstrated a reasonable probability that impeaching Officer Rogillio with his prior testimony would have changed the outcome. As for Mr. Dornier's failure to appear on the petitioner's behalf at the post-trial motion hearing, the petitioner was not prejudiced because the court assigned new counsel and continued the hearing.

27

The petitioner has failed to explain how any of the alleged deficiencies of counsel located throughout his habeas petition led to an erroneous result or how the outcome would have been any different but-for the alleged deficiencies. The court notes that the circumstances of the petitioner's representation were less than ideal. However, as discussed above, ideal or perfect representation is not the constitutional standard for ineffective assistance of counsel. The state court did not unreasonably apply the *Strickland* standard in concluding that the petitioner's ineffective assistance of counsel claims are without merit.

### *Claims (6): Prosecutorial Misconduct*

In Claim 6, the petitioner asserts that he is entitled to habeas relief due to prosecutorial misconduct. The petitioner claims that that prosecution knowingly used perjured testimony in violation of *Napue v. People of the State of Illinois*, 360 U.S. 264 (1959), because Officer Rogillio's trial testimony was inconsistent with the police report and his testimony during the preliminary hearing.[45] The petitioner also claims that the prosecution committed a *Brady* violation because they failed to disclose in discovery that the victim would testify about the backseat latches of her car being ajar.

*Napue* Claim

Officer Jeffrey Rogillio responded to the incident on January 17, 2012 that resulted in the petitioner's arrest. He prepared a "Supplemental Narrative," which was part of the Gonzales Police Department Case Report, which states (in pertinent part):

> It was at this time, security officers pulled open the trunk and found Talandis hiding inside the vehicle. Security officers removed Talandis out of the vehicle and escorted him inside. As Talandis was walking inside, security officers noticed two sets of tie wraps in

---

[45] The petitioner also complains about his counsel's failure to adequately cross examine Officer Rogillio regarding his inconsistent statements, which is addressed in the Ineffective Assistance of Counsel section, above.

his rear pocket.  Talandis' jacket was found in the trunk of the vehicle and brought inside. Upon looking into Talandis' jacket, I located a short length of duct tape and a small, all black in color, plastic revolver.[46]

On June 25, 2012, Officer Jeff Rogillio from the Ascension Parish Sheriff's Office provided the following testimony at the preliminary hearing with respect to the jacket, toy gun and duct tape:  He was dispatched to St. Elizabeth's hospital on January 17, 2012.[47]  The petitioner was inside the hospital when he arrived.[48] He placed the petitioner in custody.[49]  He then found the jacket in of the trunk of the victim's car.[50]  Inside of the jacket, Officer Rogillio found some small pieces of duct tape and a "little plastic revolver firearm."[51]  The police report suggests the jacket was inside the hospital with the petitioner when he arrived.  However, Officer Rogillio clearly testified during the preliminary hearing that he found the jacket in the trunk of the car.

At trial, Officer Rogillio testified:  He was dispatched to St. Elizabeth's hospital on January 17, 2012.  After speaking with the security officers, he took the petitioner into custody.[52]  He then used a key to the vehicle he found on Mr. Cotton and opened the trunk.[53]  Upon being asked about the trunk on direct examination, Officer Rogillio testified:

> A.     At the time, based on what I had been told, I wanted to see if he was able to access the vehicle with the key, so I closed the trunk and opened it back up with that little key.
> Q:     Did the trunk stay open?
> A:     Yes, ma'am, it stayed open the entire time I was there until I shut it.
> Q:     It didn't automatically close?

---

[46] R. Doc. 6-4, p. 127.
[47] R. Doc. 6-1, p. 4.
[48] R. Doc. 6-1, p. 4.
[49] R. Doc. 6-1, p. 5.
[50] R. Doc. 6-1, p. 6.
[51] R. Doc. 6-1, pp. 6, 11.
[52] R. Doc. 6-2, 188.
[53] R. Doc. 6-2, 193.

A:    No ma'am.

Q:    And is that all you did?

A:    Yes, ma'am. Well there was the items that were in the photos. The little gun was actually found in his jacket pocket. [54]

Officer Rogillio testified about photographs showing the items removed from the jacket,[55] but was never directly asked by the prosecution on direct examination where the jacket was located when he arrived on the scene.  On cross examination, Officer Rogillio testified that the jacket was located in the possession of the petitioner in the security office.[56]  The defense did not attempt to impeach Officer Rogillio with his prior inconsistent testimony from the preliminary hearing.

Bruce Pearson, an off-duty Livingston Parish Sheriff's Deputy, testified that he was present when the petitioner was found in the trunk of Ms. Cotton's vehicle.[57]  Pearson testified that the petitioner was wearing a black leather jacket and dark pants.  The petitioner took the jacket off and folded it on a chair in the hospital emergency room area.[58]

To establish a claim under *Napue,* a defendant must prove that the witness's testimony "was (1) false, (2) known to be so by the state, and (3) material." *Summers v. Dretke,* 431 F.3d 861, 872 (5th Cir.2005).  After reading the preliminary hearing transcript and the trial transcript, it appears that the prosecution was aware that Officer Rogillio was either unclear about where he found the jacket or had given incorrect testimony at the preliminary hearing.  The prosecution avoided questioning Officer Rogillio at trial about where the jacket was found.  However, the defense asked the question on cross-examination and Officer Rogillio testified that the jacket

---

[54] R. Doc. 6-2, p. 193-194.
[55] R. Doc. 6-2, p. 191.
[56] R. Doc. 6-2, p. 195.
[57] R. Doc. 6-2, pp. 200-202.
[58] R. Doc. 6-2, pp. 203-204.

was found with the petitioner, which contradicted his testimony from the preliminary hearing
that he had found the jacket in the trunk of the car. Even if Officer Rogillio's trial testimony on
cross-examination about the location of the jacket was a lie, when the defense elicits the alleged
perjury on cross-examination, no material falsehood has occurred because the state has not itself
knowingly presented false testimony. *U.S. v. O'Keefe*, 128 F.3d 885 (5th Cir. 1997). For this
reason, the petitioner's *Napue* claim fails.

<u>*Brady* Claim</u>

The petitioner contends that the prosecution committed a *Brady* violation when it failed
to disclose that the victim intended to testify that the backseat latch on her car was found ajar. At
trial, the victim testified that there are two release buttons in the trunk of the car for the purpose
of putting the backseats down.[59] The victim testified that the seat was partially down when the
petitioner was found in the trunk of the vehicle.[60]

"[T]he suppression by the prosecution of evidence favorable to an accused ... violates due
process where the evidence is material either to guilt or to punishment, irrespective of the good
faith or bad faith of the prosecution." *Banks v. Dretke,* 540 U.S. 668, 691(2004) (*quoting Brady,*
373 U.S. at 87). To prevail on a *Brady* claim, "[t]he evidence at issue must be favorable to the
accused, either because it is exculpatory, or because it is impeaching; that evidence must have
been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."
*Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). Evidence is material where there exists a
"reasonable probability" that had it been disclosed the result at trial would have been different.
*Banks v. Dretke,* 540 U.S. 668, 699 (2004). "A 'reasonable probability' is a probability

---

[59] R. Doc. 6-2, p. 129.
[60] R. Doc. 6-2, pp. 129-130.

31

sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985).

The victim's testimony about the backseat latch in her car was not favorable to the petitioner. The victim's testimony that the backseat had been pushed down suggested that the petitioner intended to gain access to the interior of the car through the trunk. The state had no duty to disclose this testimony because it was not helpful to the defense. Furthermore, the position of the backseat was insignificant to the outcome of the trial, given the other testimony regarding the location of the petitioner in the trunk, his possession of a toy gun, zip ties and duct tape, and the testimony of the victim regarding the prior incident with the victim where he held her against her will.

### Claim (7): Jury Instructions

In Claim 7, the petitioner asserts that the trial court failed to instruct the jury on all of the essential elements of the responsive verdict offenses of attempted simple kidnapping and attempted second degree kidnapping.[61] The state contends that this claim is procedurally defaulted because the First Circuit ruled on direct appeal that the petitioner's counsel failed to contemporaneously object to the jury instructions. However, the jury instruction assignment of error that was addressed by the First Circuit related to the failure of the court to instruct the jury on the definition of "dangerous weapon" and the failure of the court to instruct the jury on the petitioner's "medical records" affirmative defense. The petitioner raised the issue of the failure of the trial court to instruct the jury on all of the elements of the responsive verdict offenses in his application for post-conviction relief.[62] The trial court did not address this claim in its ruling

---

[61] R. Doc. 1-1, p. 33.
[62] R. Doc. 6-4, pp. 113-114.

on the petitioner's application for post-conviction relief.[63]  Accordingly, the court will conduct plenary review of this claim. *Gonzales v. Thaler*, 643 F.3d 425 (5th Cir. 2011).

Improper jury instructions in state criminal trials do not generally form the basis for federal habeas relief.  *Estelle v. McGuire*, 502 U.S. 62 (1991) (stating that federal habeas courts do not grant relief solely on the basis that a jury charge was erroneous).  In examining habeas claims of improper jury instructions, the "inquiry is not whether there was prejudice to the [petitioner], or whether state law was violated, but whether there was prejudice of constitutional magnitude."  *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir.1986).  The relevant inquiry is whether the failure to give an instruction "by itself so infected the entire trial that the resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141 (1973).  Moreover, there is a strong presumption that errors in jury instructions are subject to harmless-error analysis.  Thus, even if the instruction was erroneous, if the error is harmless, habeas corpus relief is not warranted.  *Brecht v. Abrahamson*, 507 U.S. 619, 623–24 (1993).  In a habeas proceeding, a constitutional error is not harmless if it "had substantial and injurious effect or influence in determining the jury's verdict." *Id.* (internal quotation marks and citation omitted).

The court instructed the jury by using language tracking the attempt statute, La. R.S. 14:27.[64]  The trial court also instructed the jury on the elements of attempted aggravated kidnapping by tracking the language of the statute, La. R.S. 14:44.[65]  The trial court then instructed the jury on the responsive verdicts of attempted second degree kidnapping and attempted simple kidnapping.[66]  The jury instructions included the elements of attempted second

---

[63] R. Doc. 6-4, pp. 161-162.
[64] Trial Record, p. 76.
[65] Trial Record, p. 76.
[66] Trial Record, p. 79.

degree kidnapping, which tracked the relevant language of La. R.S. 14:44.1[67] and the elements of attempted simple kidnapping, which tracked the relevant language of La. R.S. 14:45.[68]

Contrary to the petitioner's assertion, a review of the record shows that the jury was, in fact, instructed on all of the elements of the crimes of attempted second degree kidnapping and attempted simple kidnapping.  Thus, the jury was charged on all of the elements of the offenses as required by the Due Process clause and the Sixth Amendment.  *United States v. Gaudin*, 515 U.S. 506 (1995).  To the extent the petitioner is asserting that his counsel was ineffective for failing to object to the jury instructions, that claim also fails.  *See Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002) (concluding that counsel is not required to make frivolous objections).

### Certificate of Appealability

Should the petitioner pursue an appeal, a certificate of appealability should also be denied.  An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."  28 U.S.C. § 2253(c)(1)(A).  Although the petitioner has not yet filed a Notice of Appeal herein, the Court may address whether she would be entitled to a certificate of appealability.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2).

In cases where the Court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented

---

[67] Trial Record, p. 80.
[68] Trial Record, p. 81.

are adequate to deserve encouragement to proceed further." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), *quoting Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In the instant case, the Court finds that reasonable jurists would not debate the denial of petitioner's application or the correctness of the substantive ruling. Accordingly, it is appropriate that, in the event that the petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

## **RECOMMENDATION**

It is recommended that the petitioner's application for habeas corpus relief be denied, and that this proceeding be dismissed. It is further recommended that in the event the petitioner pursues an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on November 6, 2019.

**RICHARD L. BOURGEOIS, JR.**
**UNITED STATES MAGISTRATE JUDGE**